# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                          Case No. 06-CR-336

GABRIEL URBINA, et. al.,

        Defendants.

## RECOMMENDATIONS REGARDING THE DEFENDANTS' PRETRIAL MOTIONS

This complex, twenty-four defendant, cocaine distribution conspiracy case began by way of a criminal complaint on November 29, 2006. (Docket No. 1.) On December 14, 2006, the grand jury returned a sixteen count indictment alleging in count one that all defendants conspired to distribute more than five kilograms of cocaine, in violation of Title 21, United States Code, Section 841(a)(1). (Docket No. 60 at 1-2.) The remaining counts allege various violations of the controlled substances laws. (Docket No. 60 at 4-18.) Also included in the indictment was a notice of forfeiture. (Docket No. 60 at 19.)

This case was designated as complex pursuant to the district's local rules, and on January 17, 2007, the court held a status conference to discuss the dissemination of discovery and further scheduling in this matter. (Docket Nos. 150; 156.) The court ordered the establishment of a Discovery Coordinating Committee ("DCC") (Docket No. 150), which met with the court on February 20, 2007 to discuss an appropriate motion and briefing schedule in this case, (Docket Nos. 188; 190.) The court ordered all "non-evidentiary" motions to be filed no later than June 1, 2007,

and "evidentiary" motions and motions relating to Title III matters to be filed no later than August 1, 2007. (Docket No. 190.) Non-evidentiary motions are those that can be resolved without the need for an evidentiary hearing. Evidentiary motions are those for which a hearing is requested in order to resolve the motion.

Various defendants filed non-evidentiary motions, which were resolved by this court on July 31, 2007. (Docket No. 275.) Therefore, this recommendation deals with the evidentiary and Title III motions filed by the defendants.

In accordance with this court's pretrial order, Brijido Aguilera filed a motion to suppress, (Docket No. 278), Leonardo Urbina filed a motion to suppress Title III evidence, (Docket No. 286), Jose R. Quinonez filed a motion to suppress Title III evidence, (Docket No. 284), Miguel A. Valdez filed a motion to suppress cell phone contents, (Docket No. 281), Sean D. Kruschke filed a motion to suppress his statement, (Docket No. 277), and Jonathan David Colla filed a motion to suppress evidence as the result of an unlawful arrest, (Docket No. 279).

Only Miguel A. Valdez, (Docket No. 281), Sean D. Kruschke, (Docket No. 277), and Jonathan David Colla, (Docket No. 279), requested evidentiary hearings. On August 10, 2007, the government responded to the defendants' requests for evidentiary hearings. (Docket No. 293.) On August 13, 2007, this court granted Miguel A. Valdez's and Sean D. Kruschke's requests for evidentiary hearings but denied Jonathan David Colla's request. (Docket No. 294.) On August 31, 2007, the government filed a response to the substance of the defendants' motions. (Docket No. 300.)

Evidentiary hearings were conducted on September 24, 2007 and October 18, 2007. A summary of the evidence adduced at those hearings is set forth below. The pleadings on the defendants' motions are closed and the matters are ready for resolution. The Honorable Lynn Adelman has yet to set a trial date in this matter.

**MOTIONS FOR WHICH AN EVIDENTIARY HEARING WAS NOT CONDUCTED**

**Jonathan David Colla**

Jonathan David Colla alleges that the affidavit in support of the warrant upon which he was arrested did not set forth probable cause and therefore his arrest was without a lawful basis. Specifically, Jonathan David Colla alleges that (1) the allegations in the affidavit are conclusory and thus did not permit the issuing judicial office to independently determine whether there was probable cause for the arrest; and (2) the affidavit dose not provide any basis as to why the affiant believed Jonathan David Colla was a participant in the intercepted conversations where cocaine was allegedly discussed. (Docket No. 279-1 at 3-4.) The government responds by arguing that there was ample probable cause set forth in the affidavit to support the arrest of Jonathan David Colla. (Docket No. 300 at 2-4.)

An arrest warrant shall not be issued absent probable cause. U.S. Const. amend. IV. Probable cause is a fluid concept, United States v. McNeese, 901 F.2d 585, 592 (7th Cir. 1990), determined by the "totality of the circumstances." Illinois v. Gates, 462 U.S. 213, 238 (1983). The probable cause determination of the judicial officer who issued a warrant shall be afforded great deference and will be upset only if there was not a "substantial basis" for issuing the warrant. Gates, 462 U.S. at 236.

As it relates to Jonathan David Colla, the affidavit in support of the complaint alleged that he "[p]urchased cocaine from Javier (1/8 -1/4 ounce amounts)." (Docket No. 279-4 at 9.) Jonathan David Colla is referred to in paragraph thirteen of complaint as one of twenty-two persons who Javier Aguilera distributed cocaine to. (Docket No. 279-4 at 10-11.) Paragraphs seventy-three through seventy-five of the complaint contain the majority of the allegations relating the Jonathan David Colla. (Docket No. 279-4 at 35-36.) In these paragraphs, it is alleged that Jonathan David Colla had nineteen drug related conversations with Javier Aguilera during the time that Javier

Aguilera's cellular telephone calls were intercepted between July 11, 2006 and August 25, 2006. (Docket No. 279-4 at 35, ¶73.) The affidavit states "Javier Aguilera referred Colla to Aguilera's cousin, Christian Gabriel Martinez, a/k/a "Cordo," in order to obtain additional amounts of cocaine. Aguilera also used Colla to test the purity of cocaine that Aguilera had purchased on August 14, 2006." (Docket No. 279-4 at 35, ¶73.) The affidavit also contains excerpts from calls between Jonathan David Colla and Javier Aguilera. In one call, occurring on July 14, 2006, Jonathan David Colla requests what the affiant knows based upon his training and experience and familiarity with the investigation to be an eighth ounce of cocaine. (Docket No. 279-4 at 36, ¶74.) In another call on August 12, 2006, Javier Aguilera told Jonathan David Colla that he was not available and instructed him to call his cousin, whom the affiant knows to be Jose Aguilera. (Docket No. 279-4 at 36, ¶75.)

The majority of allegations contained in the affidavit in support of the complaint that relate to Jonathan David Colla are simply conclusory statements with no indication as to the affiant's source of knowledge to make these statements. For example, there is no indication as to what evidence supports the conclusion that to Jonathan David Colla "[p]urchased cocaine from Javier (1/8 -1/4 ounce amounts)." (Docket No. 279-4 at 9.) However, this conclusory statement bears little relevance to the probable cause calculus. Most significant are the paragraphs relating to the intercepted telephone calls between Jonathan David Colla and Javier Aguilera. The affidavit refers to and quotes a conversation where Jonathan David Colla requests an eighth of an ounce of cocaine from Javier Aguilera. Although Jonathan David Colla points out that the affidavit does not explain how it was that the affiant identified Jonathan David Colla as the person talking to Javier Aguilera, it is not necessary that the affiant include all of the facts relating to the background of the investigation in order to establish probable cause for an individual's arrest. Under these circumstances, the affiant's assertion that it was Jonathan David Colla on the phone was sufficient. Jonathan David Colla's request for cocaine combined with the fact that he engaged in eighteen

4

other drug related conversations with Javier Aguilera during the roughly month-and-a-half that Javier Aguiler's phone was monitored by the government is sufficient to establish probable cause that Jonathan David Colla was involved in the alleged cocaine distribution conspiracy. Therefore, the court shall recommend that Jonathan David Colla's motion to suppress, (Docket No. 279), be denied.

**Brijido Aguilera**

Brijido Aguilera seeks suppression of all evidence obtained from a camera and video transmitter installed on a utility poll outside of his Waukesha, Wisconsin home. Brijido Aguilera argues that such warrantless surveillance contravened the Fourth Amendment. (Docket No. 278.) The government alleges that camera was not installed on the defendant's property and argues that case law establishes that the installation of such cameras is lawful under the Fourth Amendment. (Docket No. 300 at 2.)

The issue of the constitutionality of silent video surveillance installed by law enforcement outside of a suspect's residence appears to be an issue of first impression in this circuit. Research discloses that this issue has been presented under factually analogous circumstances to only the Tenth Circuit Court of Appeals, see United States v. Jackson, 213 F.3d 1269 (10th Cir. 2000), and the Fifth Circuit Court of Appeals, see United States v. Cuevas-Sanchez, 821 F.2d 248 (5th Cir. 1987). Additionally, the court has identified two state courts that have addressed the issue under analogous circumstances. See State v. Costin, 168 Vt. 175, 720 A.2d 866 (1998); State v. Holden, 964 P.2d 318 (Utah Ct. App. 1998); see also Christopher Slobogin, *Public Privacy: Camera Surveillance of Public Places and the Right to Anonymity*, 72 Miss. L.J. 213, 236 n.106 (2002).

In Cuevas-Sanchez, based upon substantial investigation, law enforcement suspected the defendant's residence was used in drug trafficking. 821 F.2d at 249. Therefore, the agents applied for and received a court order authorizing the installation of a video surveillance camera atop a

power pole enabling the agents to view the defendant's backyard over his ten-foot-high fence. Id. at 249-50. Based upon evidence obtained from this surveillance, the defendant was arrested and charged. Id. at 250. The Fifth Circuit held that the defendant had a reasonable expectation of privacy to be free from such video surveillance and it was the sort of expectation that society was prepared to recognize as reasonable. Id. at 251. Therefore, the video surveillance constituted a search under the Fourth Amendment. Id. The Fifth Circuit then turned to the issue of whether the court order the agents received sufficiently protected the defendant's Fourth Amendment rights. Id. The court recognized that video surveillance is not covered under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, but held that the Title III standards are the appropriate standards to apply when a court is determining whether to authorize such video surveillance. Id. at 251-52. Because the order and the surveillance complied with the requirements under Title III, the court held that the evidence could be properly used against the defendant at trial. Id. at 252.

In Jackson, the defendant argued that the government violated the Fourth Amendment when it installed video cameras on telephone poles without a warrant. 213 F.3d at 1280. The court rejected this argument, holding that the defendant did not have a reasonable expectation of privacy in the areas observed by the surveillance cameras. Id. at 1281. The court noted that "the video cameras installed on the telephone poles were incapable of viewing inside the houses, and were capable of observing only what any passerby would easily have been able to observe." Id.

In Costin, the Supreme Court of Vermont addressed whether the police violated the Vermont Constitution when they entered onto the defendant's secluded rural land, observed numerous marijuana plants growing about 150 feet behind his residence, returned to install a camera that recorded the defendant tending to the plants, and then re-entered the property to retrieve the camera. 168 Vt. at 175-76, 720 A.2d at 866-67. The defendant did not raise his argument under

the United States Constitution because he conceded in his brief that "Oliver v. United States, 466 U.S. 170, 178-79 (1984), allows the police, without a warrant, 'to electronically eavesdrop on private activities in 'open fields' because this is not a constitutionally protected area.'" Id. at 177 n.2, 720 A.2d at 867. Although the argument was presented under the Vermont Constitution, the court's analysis is relevant to the issues presently before this court.

The Vermont Supreme Court had little difficulty determining that the police were permitted to enter into the "open fields" of the defendant's thirty-acre property, id. at 177-80, 720 A.2d at 867-69, and therefore turned to the issues raised specifically by the video surveillance. The court noted "[t]he video camera recorded only what an officer standing in the same position would have observed with the naked eye. Thus, it is a substitute for the traditional stake-out where a law enforcement officer conceals himself and waits to make the same observation as the video camera would make." Id. at 181, 270 A.2d at 870 (citation omitted). The court reasoned that the use of a video camera is, in fact, less of an invasion of privacy than would occur if the police had chosen to place an officer in the woods surrounding the defendant's home because a camera has only a limited field of view. Id. Further, the court noted that if law enforcement was not permitted to rely upon technology such as video cameras rather than traditional manpower to accomplish the same goals, it would be necessary to employ additional law enforcement officer and "[i]t certainly does not advance a free society for the judiciary to require the employment of more law enforcement personnel to properly enforce the criminal laws." Id. The court concluded that because the police officers' actions did not implicate a privacy interest protected under the Vermont Constitution, no warrant was required. Id. at 181-82, 720 A.2d at 870.

Finally, in Holden, the Utah Court of Appeals held that the police did not violate the Fourth Amendment when it installed a covert surveillance camera in a neighbor's house, with the neighbor's permission, to record a large amount of traffic coming and going from the defendant's

home and the defendant's activities outside of his house. 964 P.2d at 319-20. The court noted that "[a]lthough it is understandable that a person may feel 'an immediate negative visceral reaction' to the thought of his house constantly being monitored by videotape," the officers in this case were viewing by way of a camera nothing more than what was already in public view. Id. at 321 (quoting Cuevas-Sanchez, 821 F.2d at 251). Therefore, the Fourth Amendment was not implicated. Id.

According to Brijido Aguilera's motion, the video camera installed by the agents "was used to view the entry to Mr. Aguilera's driveway." (Docket No. 278 at 1.) The government states that the camera "captured activity outside the front of [the defendant's residence]." (Docket No. 300 at 2.) Investigative reports provided by the government state that "[t]he pole camera's view captured vehicles entering and exiting the driveway of [the defendant's residence]. This activity was monitored and at times recorded." (Docket No. 293-3; see also Docket No. 293-2 ("The camera was installed to view the entry to the driveway located at this residence in an attempt to identify individuals coming and going from this residence.").) Further, the government states that this camera was installed on a telephone pole that was not located on the defendant's property. (Docket No. 300 at 2.)

The Fourth Amendment protects individuals from unreasonable searches and seizures. A defendant objecting to a particular police action on the grounds that it constitutes a search under the Fourth Amendment bears the burden of demonstrating a legitimate expectation of privacy in the interest invaded. United States v. French, 291 F.3d 945, 951 (7th Cir. 2002) (citing United States v. Ruth, 65 F.3d 599, 604 (7th Cir. 1995)). A reasonable expectation of privacy consists of two elements. Id. First, there is a subjective element where the defendant must demonstrate that he had an actual expectation of privacy in the interest invaded. Id. Second, the expectation of privacy must be "one that society is prepared to recognize as reasonable." Id. (quoting Ruth, 63 F.3d at 604.)

"What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." California v. Greenwood, 486 U.S. 35, 41 (1988) (quoting Katz v. United States, 389 U.S. 347, 361 (1967)). The Seventh Circuit has explicitly held that an individual does not have a reasonable expectation of privacy in his driveway absent evidence that the public access was somehow limited. United States v. Evans, 27 F.3d 1219, 1229 (7th Cir. 1994). The expectation of privacy in a driveway entrance, as opposed to some portion of a driveway well onto private property, would necessarily be less given that by its very nature as the threshold between the public realm of the street and the more private areas of a home's curtilage, it is accessible and visible to all persons whether they are merely curious neighbors or investigating law enforcement agents. See French, 291 F.3d at 953-54. Further, in Greenwood, the Supreme Court has held that a person does not have a reasonable expectation of privacy in that area where private property meets the public street, when it held that a defendant does not have a reasonable expectation of privacy in garbage left at the curb outside his house. 486 U.S. at 41-42.

If the investigative agents had chosen to utilize traditional surveillance methods and parked across the street and simply monitored the persons coming and going from the defendant's residence, it is unlikely that such actions would have inspired a motion to suppress; such actions are clearly constitutional. However, such traditional surveillance methods are distinct from the omnipresence of a covert surveillance camera. "[I]t [is] unarguable that television surveillance is exceedingly intrusive . . . and inherently indiscriminate, and that it could be grossly abused -- to eliminate personal privacy as understood in modern Western nations." United States v. Torres, 751 F.2d 875, 882 (7th Cir. 1984). "This type of surveillance provokes an immediate negative visceral reaction: indiscriminate video surveillance raises the spectre of the Orwellian state." United States v. Nerber, 222 F.3d 597, 602 (9th Cir. 2000) (quoting Cuevas-Sanchez, 821 F.2d at 251).

There are many legitimate reasons for this court and the general public to be concerned about indiscriminate law enforcement video surveillance, particularly if it is aimed at private homes. Turning to the specific facts of this case, those valid privacy concerns are not implicated. The court finds that the fact that law enforcement chose to install a surveillance camera, as opposed to utilizing more traditional surveillance techniques, does not change the result from a Fourth Amendment perspective. Unlike the surveillance in Cuevas-Sanchez, the agents in the present case were not surveilling anything that was not otherwise visible using traditional street-level surveillance techniques. Here, the camera which was installed on a utility pole, was unable to view any area where a person may have a reasonable expectation of privacy. Certainly, video cameras installed upon utility poles have the potential to invade a person's reasonable expectation of privacy, as the facts in Cuevas-Sanchez demonstrate, but that was not the situation in the present case. The video camera captured nothing more than persons coming and going from the defendant's residence who were otherwise exposed to public view. As such, Brijido Aguilera had no reasonable expectation of privacy in the end of his driveway, and thus the Fourth Amendment was not implicated by the agents' surveillance. Therefore, the court shall recommend that Brijido Aguilera's motion to suppress, (Docket No. 278), be denied.

**Leonardo Urbina and Jose R. Quinonez**

Leonardo Urbina and Jose R. Quinonez have both filed motions seeking the suppression of evidence obtained by way of court-authorized wiretaps. (Docket Nos. 286; 284.) Leonardo Urbina argues that the order that authorized the interceptions of the telephone calls was overly broad. (Docket No. 286 at 2-3.) Jose R. Quinonez similarly argues that the orders authorizing the interceptions were defective on their face, specifically in that the orders failed to order the government to minimize their monitoring. (Docket No. 284.) The government responds by first arguing that the defendants have standing to challenge only the calls to which they were a party or

for some other reason can establish a privacy interest. (Docket No. 300 at 7.) Further, the government argues that the defendants are unable to point to a single call that was improperly minimized. (Docket No. 300 at 8.) Even if the defendants were to point to a particular call that they argued was not properly minimized, the standard is one of reasonableness and thus suppression is not appropriate because there was no unreasonable failure to minimize. (Docket No. 300 at 9.)

Leonardo Urbina has replied, reasserting his argument that suppression is appropriate if an order is defective on its face by failing to command minimization. (Docket No. 306.) Jose R. Quinonez argues in reply that he has standing to challenge all calls in the wiretap order involving Gabriel Urbina, because Jose R. Quinonez was listed in the order as a target. (Docket No. 305.) Further, he argues suppression is appropriate because the wiretap order is overbroad on its face; he emphasizes that he is not challenging any particular lack of minimization. (Docket No. 305.)

On June 12, 2006, pursuant to 18 U.S.C. § 2518, the Honorable Lynn Adelman authorized the interception of telephone conversations to and from the land line used by Federico Meza. (Docket No. 300 at 5.) On July 11, 2006, Judge Adelman then authorized the interception of telephone calls to and from the cellular telephone used by Javier Aguilera. (Docket No. 300 at 5.) On August 29, 2006, Judge Adelman authorized the interception of telephone calls to and from the cellular telephone used by Gabriel Urbina. (Docket Nos. 300 at 6; 300-2.)

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq., includes a mandate that "[e]very order and extension thereof shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communication not otherwise subject to interception under this chapter . . . ." 18 U.S.C. § 2518(5).

All orders issued in this case contain the following order regarding minimization:

IT IS ORDERED FURTHER that all monitoring of wire communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending

11

investigation, in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and, if minimized, the monitoring personnel shall spot check to insure that the conversation has not turned to criminal matters. Also, monitoring of conversations must immediately terminate when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.

(Docket Nos. 284 at 3; 300-2 at 5.)

The defendants argue that this portion of the order regarding minimization is overbroad in that it permits agents to intercept calls that are merely "criminal in nature" and permits "agents to listen to calls unrelated to the investigation at hand, so long as the conversation does not involve the target of the wiretap and the conversation is 'criminal in nature.'" (Docket No. 284 at 3-4.) Thus, the defendants argue that the order is in direct conflict with 18 U.S.C. § 2510, "which requires that the court limit the interceptions to calls relevant to the crimes specifically mentioned in the affidavit and supported by probable cause." (Docket No. 284 at 4.)

In United States v. Mansoori, 304 F.3d 635 (7th Cir. 2002), the defendant argued that the minimization requirement contained in a Title III order was defective because, like the order at issue in the present case, the spot-check provision in the order referred broadly to "criminal matters" rather than the specific criminal matters for which interception was authorized. Id. at 645. Notwithstanding the fact that the court's standard of review in Mansoori was for plain error because the issues regarding the alleged deficiencies in the Title III order were not raised before the trial court, Mansoori, 304 F.3d at 645, the court's decision guides this court towards the proper resolution of the defendants' present motions.

When read in context with the other terms of the wiretap orders, that language did not give the government license to monitor all minimized conversations for any

12

mention of criminal activity, whether related to the investigation or not. The orders specifically identified the type of evidence that the authorized intercepts were intended to capture. . . . Notwithstanding the language of the spot-check provision, then, the overall terms of the orders made reasonably clear that the government was permitted to check intercepted conversations solely for discussions pertinent to the government's investigation, the nature and scope of which the face of the orders made clear."

Id. at 646. Similarly, the present order sets forth the specific crime for which interception is authorized. (Docket No. 300-2 at 1-2.) Further, the present order explicitly commands law enforcement agents to comply with the minimization requirements set forth in Chapter 119 of Title 18. In fact, the minimization paragraph of the order being challenged by the defendants contains the following limiting language at the beginning, " . . . all monitoring . . . shall be conducted in such way as to minimize the interception and disclosure of the communications intercepted to those communications **relevant to the pending investigation** . . ." (emphasis added).

The fact that the paragraph goes on to provide that agents were authorized to periodically check if a minimized conversation had turned to "criminal matters" does not expand the agents' authorization to intercept discussions about crimes other than those relevant to the pending investigation as specifically referenced in other portions of the order. The defendants' interpretation of the order as authorizing the agents to listen to discussions of all criminal matters is unreasonable. The order explicitly commands the agents to comply with the provisions of Chapter 119, which limits interception to discussion of the crimes for which interception was specifically authorized by the order. See 18 U.S.C. § 2518(4)(c).

Similarly, the fact that order commands the agents minimize the conversation when it is determined that a target is not a participant of the conversation "unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature" does not

grant the agents authority beyond that authorized under Chapter 119. The court finds nothing in this language renders the court's order to be insufficient on its face.

Furthermore, if either of the defendants was able to point to a specific call that an agent improperly intercepted based upon the agent's misinterpretation of the court's order, then the court would investigate those claims upon their merits. See 18 U.S.C. § 2518(10)(a)(iii). However, neither defendant makes any claim that the interception of any call was not made in conformity with the court's order. In fact, both defendants emphasize that they are not challenging any specific lack of minimization. (Docket Nos. 305 at 1; 306 at 1-2.) Therefore, finding no reason to conclude that the court's order authorizing interception of telephone calls was insufficient on its face, the court shall recommend that the defendants' motion to suppress, (Docket Nos. 286; 284), be denied.

**MOTIONS FOR WHICH AN EVIDENTIARY HEARING WAS CONDUCTED**

**Miguel A. Valdez**

Miguel A. Valdez ("Valdez") seeks the suppression of the results of a search of the contents of his cell phone. (Docket No. 281). Based upon the case law presented by the defendant and the government in their pleadings regarding the defendant's request for an evidentiary hearing, the court determined that the question of when precisely the search of the defendant's cell phone occurred is crucial. (Docket No. 294 at 3.) Further, the court noted that the parties failed to present any case from the Seventh Circuit that squarely addressed the issue raised by the defendant's motion. (Docket No. 294 at 3.) Therefore, the court granted the defendant's request for an evidentiary hearing. A hearing was conducted on September 24, 2007 and the court ordered the parties to submit any particularly relevant case citations by letter no later than September 28, 2007. The pleadings on the defendant's motion are closed and the matter is ready for resolution.

14

**Evidentiary Hearing Summary**

The court received testimony of only one witness, Waukesha County Sheriff Detective Robert Brenner ("Detective Brenner"). On December 3, 2006, Detective Brenner was assigned the Waukesha Metro Drug Unit and was a federally deputized task force agent with the Drug Enforcement Administration. As part of these assignments, Detective Brenner was investigating the cocaine conspiracy that is alleged in the indictment in this case and was involved in monitoring the court authorized wiretaps. However, Detective Brenner was not the affiant for any of the applications for intercepts.

On the morning of December 3, 2006, armed with an arrest warrant for Valdez, Detective Brenner and his partner, City of Waukesha Detective Eileen Micklitz ("Detective Micklitz") went to Valdez's residence. At his residence, the detectives made contact with Valdez and informed him that they had a warrant for his arrest. Valdez was cooperative and Detective Brenner placed Valdez in handcuffs. Incident to arrest, Detective Brenner searched Valdez and recovered a cell phone. Detective Brenner handed this phone to Detective Micklitz as he finished searching Valdez. Upon completing his search of Valdez, approximately one minute after he initially recovered the phone, Detective Brenner retrieved the phone from Detective Micklitz, immediately opened the phone and viewed the phone's address book and call history. In particular, Brenner said he was looking for the defendant's phone number and that of Gabriel Urbina. Detective Brenner did not listen to any voicemails. The detectives then asked Valdez's girlfriend, who was also present at the residence along with children, for consent to search the residence, which she granted. Detective Brenner does not recall recovering any items from the residence.

The detectives then waited approximately fifteen minutes for another police car to arrive to transport Valdez. Detective Brenner does not recall if Valdez was transported to the Waukesha Police Department or the Waukesha County Sheriff's Department. Detective Brenner inventoried

Case 2:06-cr-00336-LA   Filed 11/06/07   Page 15 of 28   Document 322

the cell phone and it was then transferred to the car of the evidence custodian. Detective Brenner did not write a report relating to his search of the phone but he conveyed the information that he learned from the search of the phone to Detective Micklitz and she wrote a report. A copy of this report was received by stipulation of the parties as Exhibit 1.

At roughly 5 P.M., Detective Brenner again met with Valdez. Valdez was advised of his Miranda rights, which he agreed to waive, and an interrogation proceeded. During this interrogation Detective Brenner asked Valdez about his contacts with Gabriel Urbina. Based upon the wiretaps and Detective Brenner's review of the call history in Valdez's cell phone, Detective Brenner knew that Valdez had been in contact with Gabriel Urbina.

Detective Brenner did not talk to Valdez until 5 P.M., despite the fact that Valdez was arrested at roughly 11 A.M., because during this time Detective Brenner was executing other warrants related to this case.

Detective Brenner testified that he immediately searched the phone because he was concerned that the information contained in the phone, such as the call history and the address book, could be erased. Detective Brenner testified that he regularly receives alerts from other drug investigators and recalls an alert that US Cellular enables customers to remotely delete all of the information contained on their phones, including call history and address book. Valdez had a US Cellular phone. However, Detective Brenner does not recall if he received this alert regarding the vulnerability of information on US Cellular phones before or after he searched Valdez's phone on December 3, 2006.

**Analysis**

Incident to a lawful arrest, a law enforcement officer is authorized to search an arrestee's person and the areas within the arrestee's immediate control for weapons or evidence. Michigan v. DeFillippo, 443 U.S. 31, 35 (1979) (citing United States v. Robinson, 414 U.S. 218, 235 (1973));

United States v. Griffith, 537 F.2d 900, 902 (7th Cir. 1976). A search incident to arrest may include the search of containers. See, e.g., United States v. Robinson, 414 U.S. 218, 235-36 (1973) (upholding the search of a crumpled cigarette package); United States v. Molinaro, 877 F.2d 1341, 1346-47 (7th Cir. 1989) (upholding search of wallet); United States v. Rodriguez, 995 F.2d 776, 778 (7th Cir. 1993) (upholding the search and photocopying of defendant's address).

The Seventh Circuit, relying upon United States v. Chan, 830 F. Supp. 531, 533 (N.D. Cal. 1993), analogized a pager to a container and determined that a police officer's search of a pager incident to arrest did not violate a defendant's rights under the Fourth Amendment. United States v. Ortiz, 84 F.3d 977, 984 (7th Cir. 1996). Further, the court noted that an immediate search was necessary in order to effectively preserve the information contained on the pager because of the pager's finite electronic memory and the fact that each incoming page may destroy a stored telephone number. Id. Further, the court recognized that the data could be easily destroyed either by the unit losing power or simply touching a button. Id.

The court has been unable to locate any case wherein the Seventh Circuit has addressed the specific issue of a search of a cell phone incident to arrest. However, at least one district court within this circuit, the Northern District of Illinois, has addressed the propriety of a law enforcement officer's search of a cell phone incident to arrest. In United States v. Cote, 2005 U.S. Dist. LEXIS 11725 (N.D. Ill. 2005), the court analogized a cell phone to a wallet or an address book and therefore upheld the an FBI agent's search of a cell phone's call log, phone book, and wireless web inbox, as a valid search incident to arrest. Id. at 19-20.

Outside the circuit, this issue has been squarely addressed by other district courts and at least one circuit court of appeals. Recently, the Fifth Circuit addressed the issue in United States v. Finley, 477 F.3d 250 (5th Cir. 2007). Relying in part upon Ortiz, the court analogized a cell phone to a closed container and held that the recovery of the call records and text messages stored on the

17

defendant's phone was authorized by virtue of the defendant's arrest. Id. at 260. The court held that the fact that the search occurred after the defendant was transported from the scene of his arrest to a second location did not affect the analysis, because the cell phone, as an object found on his person at the time of his arrest, was immediately associated with his person. Id. at 260 n.7 (quoting United States v. Chadwick, 433 U.S. 1, 15 (1977)).

In United States v. Zamora, 2005 U.S. Dist. LEXIS 40775 (N.D. Ga. 2005), relying in part upon Ortiz, the Magistrate Judge recommended that the search of the defendants' cell phones as a valid search incident to arrest be upheld because "the contents of the cell phones can be altered by each incoming call or by other events beyond the agent's control creating an exigency to conduct the search before the cell phone memory is altered." Id. at 32. Based upon these reasons, the District Judge adopted the Magistrate Judge's recommendation. 2006 U.S. Dist. LEXIS 8196.

Despite the fact that seemingly few courts have addressed this issue, there have been three separate cases out of the District of Kansas that have addressed the issue of a search of a cell phone incident to arrest. In all of these cases, the court upheld the search of the defendant's cell phone incident to arrest. In United States v. Espinoza, 2007 U.S. Dist. LEXIS 25263 (D. Kan. 2007), incident to the defendant's arrest on drug charges, a state trooper did not simply search but rather downloaded the contents of the defendant's cell phone. Id. at 5. Relying in party upon Ortiz, the court found that the same exigencies that courts have relied upon to justify the searches of pagers justified the trooper's actions in downloading the cell phone data. Id. at 20.

In United States v. Mercado-Nava, 486 F. Supp. 2d 1271 (D. Kan. 2007), again relying part upon Ortiz, the court found that law enforcement's interest in preventing the destruction of evidence justified the warrantless search of the defendant's cell phone incident to arrest. Id. at 1278-79.

Finally, in United States v. Parada, 289 F. Supp. 2d 1291 (D. Kan. 2003), again relying the rationale that data contained in a cell phone may be easily lost, the court upheld the search of defendant's cell phone incident to arrest and retrieval of stored telephone numbers. Id. at 1304.

Although the great weight of authority indicates that a warrantless search of a cell phone is permitted under the Fourth Amendment as a search incident to arrest, at least one district court has held otherwise. In United States v. Park, 2007 U.S. Dist. LEXIS 40596 (N.D. Cal. 2007), the court noted that

> modern cellular phones have the capacity for storing immense amounts of private information. Unlike pagers or address books, modern cell phones record incoming and outgoing calls, and can also contain address books, calendars, voice and text messages, email, video and pictures. Individuals can store highly personal information on their cell phones, and can record their most private thoughts and conversations on their cell phones through email and text, voice and instant messages.

Id. at 21-22.

The court further noted "that that the line between cell phones and personal computers has grown increasingly blurry" and therefore raised the concern that permitting the warrantless search of a cell phone incident to arrest might open the door to warrantless searches of personal computer based upon the same rationale. Id. at 23. The court distinguished Chan and Ortiz, cases involving pagers, on the basis that the privacy interests invaded were less significant than those potentially invaded in the search of a cell phone. Id. at 27. Because the court found that the officers' search of the cell phone was not motivated out of a concern for officer safety, or to prevent the concealment or destruction of evidence, but rather was purely investigatory, the court concluded that the government had not met its burden of demonstrating a valid exception to the warrant requirement. Therefore, the court granted the defendant's motion to suppress. Id. at 33.

Park is readily distinguishable from the present case. Even though he was looking for specific numbers, Detective Brenner's motives were not purely investigatory. The testimony of Detective Brenner makes clear that he searched Valdez's cell phone immediately after Valdez's arrest out of a concern that failure to do so would result in the loss of data of evidentiary value. He was trying to preserve evidence.

The court is mindful that cell phones have the capacity to store large amounts of personal information, but so too do wallets, personal address books, or any number of containers that courts have repeatedly held law enforcement are permitted to search incident to an arrest. See, e.g., United States v. Garcia, 605 F.2d 349, 355 (7th Cir. 1979) (discussing that a search of "a wallet, purse or shoulder bag" is permitted as a search incident to arrest) (citing cases). Photos of friends and family, personal correspondence, and names and addresses of associates that may have once been carried by a person in his wallet or personal address book may now be carried electronically on an individual's cell phone. The Seventh Circuit has upheld the search of an arrestee's wallet, Molinaro, 877 F.2d at 1346-47, and personal address book, Rodriguez, 995 F.2d at 778, as valid searches incident to arrest. In this regard this court considers a cell phone as analogous to these containers. But obviously, a cell phone has the capacity to contain more information than would either a wallet or an address book. For example, generally, only a cell phone contains a record of all calls placed and received. And in this regard, a search of a cell phone may be seen as constituting a more substantial invasion of an arrestee's privacy.

However, countervailing this increased privacy interest is the increased vulnerability of the data contained on a cell phone. Unlike physical effects like the contents of a wallet or an address book, which can be easily safeguarded as a warrant is obtained, the contents of a cell phone may be easily deleted, either by the replacement of old data with new, a mistaken push of a button, a loss of power, or even remotely by a person contacting the cell phone provider. It is primarily for this

reason, the fact that the data contained on a cell phone is vulnerable to loss if not promptly searched, that this court concludes that in this case, the search of a cell phone was permitted as a search incident to arrest.

Notwithstanding the foregoing conclusion, the court acknowledges the observations by the court in Park that the line between a cell phone and a personal computer is becoming increasingly blurred. Many cell phones are capable of browsing the internet or sending and receiving email just like a personal computer. Certainly, there may be many instances where the text of emails sent and received, or a list of the websites a person visited, may be of interest to law enforcement. However, whether or not law enforcement may be permitted to access these records by virtue of the fact that an arrestee happened to have his cell phone on his person at the time he was arrested is a question not presented in this case. In the case before this court, it is clear that Detective Brenner limited his search to the phone's address book and call history. If the evidence in a future case were to show that the warrantless search conducted by law enforcement was essentially equivalent to a search of a personal computer, without sufficient exigencies to justify such a search, the court's reaction may be different, because of the substantial invasion of privacy. Nonetheless, it is a question the court need not concern itself with now.

Technology continues to evolve at an ever increasing pace, but the court does not regard the invasion of privacy that occurred in the present case to be significantly different than that authorized by the Seventh Circuit is Ortiz, 84 F.3d at 984. Therefore, the court shall recommend Valdez's motion to suppress, (Docket No. 281), be denied.

**Sean D. Kruschke**

Sean D. Kruschke ("Kruschke") alleges that when he was in custody, he did not knowingly and intelligently waive his Miranda rights when he made custodial statements following his arrest, and therefore his statements should be suppressed. (Docket No. 277.) The court conducted an

evidentiary hearing on the defendant's motion to suppress on October 18, 2007. Following the hearing, the court ordered that parties to submit any particularly relevant case citations to the court in the form of a letter no later than October 24, 2007. The government, (Docket No. 319), and the defendant, (Docket No. 320), have filed responses. The pleadings on the defendant's motion to suppress are closed and the matter is ready for resolution.

### Evidentiary Hearing Summary

The government called two witnesses, Waukesha County Sheriff Detective Robert Brenner ("Detective Brenner") and DEA Special Agent Randy Furmack ("Special Agent Furmack"). The defendant testified on his own behalf and the government called Detective Brenner in rebuttal.

### Detective Brenner

On December 6, 2006, Detective Brenner was assigned to arrest Kruschke at his place of employment in Waukesha, Wisconsin. At approximately 4:45 PM, according to Detective Brenner's report which was received as Exhibit B, upon observing Kruschke approaching his vehicle, Detective Brenner, Special Agent Furmack, and another detective, approached Kruschke and arrested him without incident. Detective Brenner and Special Agent Furmack were both in plain clothes. Detective Brenner had a firearm on his belt, but it was concealed under his un-tucked shirt. They transported Kruschke to the Waukesha County Sheriff's Department and upon finding all the interview rooms occupied, took Kruschke into the roll call room. Detective Brenner described this as a large conference style room where deputies assemble before going out on patrol.

Kruschke's handcuffs were removed and Detective Brenner began to complete the form received as Exhibit A. Detective Brenner asked Kruschke basic biographical questions to complete the top portion of the form, and then he asked Kruschke the following seven questions which serve as an explanation of a person's <u>Miranda</u> rights. After each question, Kruschke responded "Yes," indicating that he understood the stated right, and Detective Brenner recorded Kruschke's response

next to each question. The space next to question eight, which states, "Understanding these rights, do you wish to make a voluntary statement," is left blank. Detective Brenner testified that it was his standard practice not to ask this question. Sometime subsequent to Kruschke's arrest, Detective Brenner has reformed his practice after being told by a Waukesha County Assistant District Attorney that he should ask all questions on the form.

Upon completing the form, and obtaining Kruschke's signature at the bottom, Detective Brenner began asking Kruschke questions relating to his involvement in the cocaine distribution conspiracy alleged in the indictment. Detective Brenner described this as relaxed open dialog. He testified that this was not an information-gathering conversation because he essentially knew all the answers to the questions he was asking based upon his prior investigation. At no time were any threats made to Kruschke. Detective Brenner believes that Kruschke may have asked to use the bathroom and may have used his cell phone. Although Detective Brenner does not specifically recall doing so, he testified that he may have picked up Kruschke's cell phone and looked through its address book and identified Javier Aguilera's phone number. Detective Brenner believes that Kruschke's statements were voluntary because of the overall circumstances of the interrogation. Specifically, the character of the room was casual, in that it was large and open with persons coming and going occasionally, Brenner was in plain clothes, no weapons were drawn, and the entire interrogation was conversational rather than confrontational. Further, at no point did Kruschke ever assert any of his constitutional rights.

### Special Agent Furmack

Special Agent Furmack was present with Detective Brenner from the point of Kruschke's arrest and through his interrogation. He recalls Detective Brenner completing Exhibit A with Kruschke and heard Detective Brenner ask Kruschke questions one through seven. In response to each question, Kruschke responded, "Yes." However, Special Agent Furmack does not specifically

23

recall seeing Kruschke sign Exhibit A. At no point were any threats or promised made, and Kruschke never invoked any of his constitutional rights. At no point were weapons drawn. Special Agent Furmack does not recall Kruschke making any requests during the interview but may have asked for something to drink. Kruschke also may have made phone calls. Throughout the interview, Kruschke was calm and relaxed and did not appear anxious or scared. He did not hesitate to make a statement and the interview was conversational. In Special Agent Furmack's recollection, the entire interview was short, perhaps an hour in length.

### Sean Kruschke

On December 6, 2006, Kruschke returned to his place of employment in a work truck, got out, and was getting into his own vehicle, when Detective Brenner and Special Agent Furmack approached him. They asked if he was Sean Kruschke, and when he responded that he was, he was told that he was under arrest. He was searched and then Detective Brenner and Special Agent Furmack identified themselves. At first he was not told why he was arrested, but later at the station he was told that he was arrested as part of a federal drug conspiracy.

He was taken to a large empty room and his handcuffs removed. Detective Brenner then asked him the information to complete the top portion of Exhibit A. At this point, another law enforcement officer left with Exhibit A and then five minutes later returned with a pack of papers. Kruschke does not recall if this unknown officer returned with Exhibit A.

As soon as he got to the Sheriff's Department, Detective Brenner retrieved Kruschke's cell phone and scrolled through its address book and upon coming to Javier Aguilera's cell phone number said, "Bingo. We got one number." Kruschke used to work with Javier Aguilera. Kruschke also testified that "in the beginning" he asked for permission to call his boss and girlfriend and he was allowed to make both calls.

Kruschke proceeded to talk to Detective Brenner about the subject of his investigation. During this conversation he was calm and he testified that he made all his statements voluntarily. However, Kruschke testified that he did not understand that his statements would be used against him.

Toward the last twenty minutes of their conversation, Detective Brenner then asked him the questions on Exhibit A explaining Kruschke's constitutional rights. In response to each question, Kruschke responded, "Yes" but when asked the question if he wanted to make a statement in writing, Kruschke said "No" because he had already given a statement. The overall interrogation lasted about one hour.

Kruschke testified that as Detective Brenner went through the top portion of Exhibit A, Detective Brenner asked Kruschke "Do you want to be on the front of the train or the back of the train?" which Kruschke understood to mean that Kruschke should tell him what he knew. Kruschke then said that Detective Brenner made this statement "in the beginning," "right before" he was read his rights.

Kruschke testified that he signed the Exhibit A at about 5:45 P.M., which was before he made his phone calls. Then, in response to his attorney's request for clarification, Kruschke stated that he made his phone calls at the end of the interrogation. Although Kruschke knew that he could have an attorney present, he did not request one because he did not think he was in trouble. Kruschke was never threatened and he never asked to use the restroom.

Kruschke testified that if he had been advised of his constitutional rights before he gave his statement he "might have" gone on to make the same statement. Later, he testified that if he was advised of his constitutional rights first, he would not have made his statement. Additionally, Kruschke testified that he is familiar with the interrogation process, including being advised of his rights, on account of the fact that he has been subjected to custodial interrogation on six or seven

prior occasions. Finally, Kruschke testified that although he was not advised of his rights until after he made his statement, the statement he made was nonetheless voluntary.

**Analysis**

"If a person is in custody, law enforcement officers may not interrogate him unless they have told the person that he has the right to remain silent, that any statement he makes may be used against him, and that he has the right to an attorney, either retained or appointed." United States v. James, 113 F.3d 721, 726 (7th Cir. 1997) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). It is undisputed that Kruschke was in custody and subjected to interrogation. It is further undisputed that Kruschke was advised of his Miranda rights. The crucial factual dispute is when Kruschke advised these rights. Detective Brenner and Special Agent Furmack allege that Kruschke was advised of his rights prior to Kruschke making any statement; Kruschke alleges that he made a statement before he was advised of his rights. Kruschke further alleges that he was then asked if he wanted to make a written statement.

In Missouri v. Seibert, 542 U.S. 600 (2004), the Supreme Court referred to the scenario Kruschke describes as the "question-first" interrogation technique. In disapproving this technique, a plurality of the Court described the "question-first" technique as a situation where a suspect is first interrogated without the benefit of the Miranda warnings and upon providing an incriminating statement, is informed of his rights and then re-interrogated and confronted with the facts provided in his earlier statement. Id. at 609-11. However, based upon Kruschke's testimony, the "question-first" technique was unsuccessful in this instance, and rather than giving a statement upon being advised of his rights, he refused.

While Seibert discusses the scenario Kruschke described, the court does not find that it occurred in this case. This is because the court does not find Kruschke's testimony that he was not read his rights until after he made his statements credible. Kruschke's testimony was inconsistent

26

and contradictory and amidst these contradictions, Kruschke confirmed Detective Brenner and Special Agent Furmack's version of events. First, and most significantly, Kruschke testified that Detective Brenner asked the question, "Do you want to be on the front of the train or the back of the train?" "in the beginning," "right before" he was read his rights. This confirms Detective Brenner and Special Agent Furmack's testimony that Kruschke was advised of his rights prior to any questioning.

Second, Kruschke initially testified on direct examination that he made his phone calls "in the beginning," but then he later testified on direct that these calls were made at the end of the conversation, specifically after he signed Exhibit A. He said that he signed Exhibit A at 5:45 p.m. Exhibit A shows that the interrogation started at 5:20 p.m. Based upon Kruschke's testimony the interview lasted about one hour, so the time he signed Exhibit A and made his phone calls would be "in the beginning." In that regard, Kruschke's testimony is consistent with that of Detective Brenner and Special Agent Furmack with respect to the fact that Kruschke was advised of his rights prior to any questioning.

Finally, on cross-examination Kruschke testified that after being advised of his rights he did wish to make a statement, but on redirect he testified his answer was "No."

The court finds that Kruschke's material inconsistencies and contradictions during his brief testimony undermine his credibility. The court finds the testimony of Detective Brenner and Special Agent Furmack to be more credible and therefore concludes that Kruschke was advised of his Miranda rights by way of Detective Brenner reading the first seven questions contained on Exhibit A and then proceeding to interrogate Kruschke. Based upon the totality of the circumstances and most significantly, Kruschke's own admission, the court finds Kruschke's waiver of rights and his subsequent statement were voluntary. Therefore, the court shall recommend that Kruschke's motion to suppress his statement be denied.

**CONCLUSION**

For the reasons set forth above, the court now enters the following recommendations on the defendants' motions:

**IT IS THEREFORE RECOMMENDED** that Jonathan David Colla's motion to suppress, (Docket No. 279), be **denied**.

**IT IS FURTHER RECOMMENDED** that Brijido Aguilera's motion to suppress, (Docket No. 278), be **denied**.

**IT IS FURTHER RECOMMENDED** that Leonardo Urbina's motion to suppress, (Docket No. 286), be **denied**.

**IT IS FURTHER RECOMMENDED** that Jose R. Quinonez's motion to suppress, (Docket No. 284), be **denied**.

**IT IS FURTHER RECOMMENDED** that Miguel A. Valdez's motion to suppress, (Docket No. 281), be **denied**.

**IT IS FURTHER RECOMMENDED** that Sean D. Kruschke's motion to suppress statements, (Docket No. 277), be **denied**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this recommendation.  Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures.  Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case.  Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 6th day of  November, 2007.

s/AARON E. GOODSTEIN
U.S. Magistrate Judge

Case 2:06-cr-00336-LA   Filed 11/06/07   Page 28 of 28   Document 322